UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| KELLY C.[1], | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 1:22cv62 |
| | ) |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|    Defendant. | ) |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Supplemental Security Income under Title XVI of the Social Security Act. Section 405(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant has not engaged in substantial gainful activity since April 17, 2019, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: migraine disorder, asthma, lumbar and cervical degenerative disc disease, neuropathy of the left leg, acoustic

2

>   neuroma, obesity, social anxiety disorder, generalized anxiety disorder, depressive disorder and attention deficit hyperactivity disorder (ADHD) (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. The claimant should avoid concentrated exposure to extreme heat, extreme cold, humidity, vibration, fumes, odors, dusts, gases and poor ventilation. The claimant should avoid unprotected heights, dangerous moving machinery, operating motorized vehicles, and slippery surfaces. The claimant should avoid bright, flashing lights like strobe lights and should avoid a very loud work environment. The claimant can frequently handle and finger with the bilateral upper extremities. The claimant can perform work requiring simple instructions and routine, repetitive tasks (defined as tasks and instructions that can be learned through short demonstration, up to and including one month). The claimant cannot perform work requiring a specific production rate, such as assembly line work. The claimant can meet production requirements that allow a flexible and goal oriented pace. The claimant can maintain the focus, persistence, concentration, pace and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods. The claimant can make only simple work-related decisions. The claimant can respond appropriately to predictable, routine changes in the workplace. The claimant can have frequent interaction with supervisors, coworkers and the general public, and contact with supervisors still includes what is necessary for general instruction, task completion or training.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on March 29, 1983 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

> 9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).
>
> 10. The claimant has not been under a disability, as defined in the Social Security Act, since April 17, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18-33).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed her opening brief on July 28, 2022.  On October 19, 2022 the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on November 14, 2022. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"? (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). In the present case, Step 5 was the determinative inquiry.

In support of remand, Plaintiff broadly argues that the ALJ's decision is not supported by substantial evidence. Plaintiff contends that the ALJ cherry-picked the evidence, overemphasized daily activities, ignored evidence, and "played doctor".

Plaintiff asserts that the ALJ improperly relied upon selective portions of a September 20, 2019 exam, and dismissed evidence in the record showing the functional limitations of Plaintiff's migraines. However, a review of the ALJ's decision shows that she considered more than the single September 2019 examination in evaluating Plaintiff's migraines (Tr. 15-33). The ALJ found Plaintiff's migraines to be a severe impairment at step two, and noted Plaintiff's allegations of 8-10 migraines per month that sometimes lasted for days (Tr. 18, 22 (referring to hearing testimony at Tr. 48-49, 85-86)). The ALJ also noted that Plaintiff reported only seeking emergency room care once or twice for her migraines in 2021 (Tr. 25 (citing Tr. 49)). The record does not contain many longitudinal treatment records regarding Plaintiff's migraines, but the ALJ discussed the available evidence. She noted a June 2019 treatment record where Plaintiff reported having two to three smaller headaches a week, with major headaches twice a month that awakened her from her sleep with nausea, vomiting, and light sensitivity (Tr. 23 (citing Tr. 488)). At that appointment, Plaintiff also complained of pain in her left leg, and the examination showed tenderness there and in her left occipital region (Tr. 23 (citing Tr. 489)). Plaintiff's gait was antalgic and tests showed neuropathy in her left leg, but her leg strength was normal (Tr. 23 (citing Tr. 489, 492)).

The ALJ discussed Plaintiff's September 2019 consultative examination, performed by

5

Abdail Jan, M.D. (Tr. 23). The ALJ noted Plaintiff's report of migraines following removal of a tumor through cyber knife surgery (Tr. 23 (citing Tr. 465)). She also noted that Plaintiff reported quite a few migraine days a month, and that she was currently experiencing a migraine during the consultative examination (Tr. 23 (citing Tr. 465)). Despite the migraine, the ALJ noted that Dr. Jan observed Plaintiff to be cooperative and not in acute distress (Tr. 23 (citing Tr. 468)). Further, she did not display any vision problems or ask to have the lighting turned down (Tr. 23 (citing Tr. 468)). Her examination was generally normal, with Plaintiff exhibiting no gross motor focal deficits, normal memory and attention span, normal gait, posture, muscle strength, and heel/toe and tandem walking (Tr. 23-24 (citing Tr. 468)). Plaintiff also demonstrated normal range of motion in most areas, but she refused to perform full range of motion tests on her low back, and she had limitations in her shoulders, knees, and hips (Tr. 24 (citing Tr. 468-70)). Dr. Jan noted that Plaintiff gave poor effort during the examination (Tr. 23-24 (citing Tr. 468)).

Dr. Jan provided a medical source statement noting Plaintiff's allegation that she can sit for 90 minutes and stand for 20 minutes, and walk for 0 blocks before having to stop due to pain (Tr. 28 (citing Tr. 469)). He noted Plaintiff's normal fine motor skills and handling of objects, normal concentration, social interaction, remote and recent memory, hearing, speech, and vision, and opined that she could carry 20 pounds short distances (Tr. 28 (citing Tr. 469)). Dr. Jan further noted that Plaintiff could not carry 20 pounds long distances, but could lift 10 pounds over her head (Tr. 28 (citing Tr. 469)).

The ALJ found Dr. Jan's opinion only partially persuasive as it was poorly supported and only somewhat consistent with the record (Tr. 28). She noted that Dr. Jan appeared to base his opinions regarding Plaintiff's ability to sit, stand, and walk almost solely on Plaintiff's subjective

report of her limitations (Tr. 28 (citing Tr. 469)). However, the ALJ acknowledged other portions of the opinion that appeared to be based on the examination, such as Plaintiff's ability to carry 20 pounds for a short distance (Tr. 28 (citing Tr. 469)).

  Plaintiff does not challenge the ALJ's finding that Dr. Jan's opinion was partially persuasive. Rather, she argues that the ALJ determined that her migraines were not disabling based solely upon her normal functioning during Dr. Jan's examination. However, as noted, there is a sparse treatment record regarding Plaintiff's migraines and she testified that she had only been to the emergency room for migraines once or twice in 2021 (Tr. 25 (citing Tr. 49)). Plaintiff does not point to any specific evidence regarding migraines that the ALJ failed to consider, nor does she cite to any treatment record showing that her migraines caused greater functional limitations. *See Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021) (plaintiff "failed to show how medically determinable impairments caused any limitations beyond those the ALJ found"); *Karr*, 989 F.3d at 513 (Plaintiff failed to carry her burden "by not identifying any objective evidence in the record corroborating" her claim). In light of the minimal treatment evidence, it was proper for the ALJ to consider Plaintiff's demonstrated functional ability during an active migraine, where she testified that migraines caused disabling photophobia, nausea, and vomiting (compare Tr. 23, 25, 48-49 with Tr. 468-69).

  The ALJ also considered Plaintiff's activities of daily living (Tr. 22-23, 25-26). The ALJ noted Plaintiff's testimony that she sometimes went to the store with her daughter, where she used a power cart; she used a chair to shower; she was able to fold laundry or help cut vegetables or fruit while sitting in a chair; and she did not drive long distances and always drove with someone (Tr. 22 (citing hearing testimony at 46-47, 50-53, 86-87, 90-91)). Plaintiff also stated

7

that she was able to grocery shop with her mother up to three times per week (Tr. 25, (citing Tr. 370)). The ALJ further noted that during Plaintiff's mental and physical consultative examinations, she reported that she was able to prepare and fix meals, interact with people in person or online, dress herself, and get her children ready for school (Tr. 23, 25 (citing Tr. 466, 474)).

Based on this evidence, the ALJ found that Plaintiff's reported daily activities were inconsistent with her allegations about the intensity of her migraines (Tr. 25). She noted that if Plaintiff's migraines were as intense and limiting as she alleged, it is unlikely that she would be able to perform her activities on a daily and routine basis (Tr. 25 (citing Tr. 474)). Specifically, Plaintiff reported headaches three times per week and more severe migraines twice a month, with post migraine symptoms of being in a dense fog such that she could not communicate with people (Tr. 23, 25, 48-49, 488). But the ALJ pointed out that those allegations were inconsistent with Plaintiff's report that she was able to grocery shop up to three times per week for an hour (Tr. 25 (citing Tr. 371)). Further, the ALJ noted the inconsistency between Plaintiff's alleged inability to communicate post-migraine, and her report of interacting with others on a daily basis online or in person (Tr. 25, 48-49, 474).

Plaintiff asserts that the ALJ did not properly consider her limitations or the fact that she needed help to accomplish her daily activities. Specifically, Plaintiff asserts that the ALJ ignored her allegations that she never drives alone, she had to shop with her mother while using a power cart, and her daily routine included significant amounts of sleeping/lying down in the dark. Contrary to Plaintiff's argument, the ALJ expressly referenced each of those reported limitations in her decision (*see* Tr. 22, 25 (noting Plaintiff and her mother stated that she "always drives with

8

someone;" she "uses a power cart" at the store; she "grocery shop[s] with her mother up to three times a week for an hour;" and migraines caused "light sensitivity")). Clearly, the ALJ did not ignore evidence or overemphasize Plaintiff's activities.

Plaintiff, in her reply brief, faults the ALJ for not analyzing whether Plaintiff would be off-task more than 15% of the workday, or miss more than one day of work per month. Plaintiff contends that experiencing two or more severe headaches a month would be work preclusive. However, the ALJ discussed Plaiintiff's allegations as to the frequency and intensity of her migraines and found that her allegations were inconsistent with the record (Tr. 23-25). As the ALJ fully supported her findings, substantial evidence supports the finding, and this Court will not re-weigh the evidence on this point.

Plaintiff also argues that the ALJ improperly "diagnosed" stress as the cause of her headaches. However, it was Plaintiff's treating neurologist who stated that "stress and anxiety dominate and are likely responsible [for] 30-50% of her headaches," and who recommended treatment with medication, hydration, sleep, and stress management (Tr. 20, 23, 25 (citing Tr. 489-90)). Thus, the ALJ did not "diagnose" the cause of Plaintiff's headaches or prescribe treatment—she accurately summarized what was in the treatment record (Tr. 20, 23, 25 (citing Tr. 489-90)). *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (ALJ did not interpret medical evidence where she accurately summarized the results of medical testing). Based on this evidence, the ALJ reasonably incorporated limitations to reduce anxiety and stress into the RFC finding (Tr. 21, 25).

Plaintiff argues that the ALJ does not address the remaining 50-70% of Plaintiff's alleged migraines and the limiting effect of those headaches on Plaintiff's ability to work. However, as

9

there was no evidence as to the cause of the remaining headaches, there were no additional limitations for te ALJ to incorporate into the RFC. In any event, as the ALJ found that Plaintiff's migraines were not as limiting as alleged, there was no basis for the ALJ to include additional migraine-related limitations into the RFC.

Plaintiff also argues that the ALJ improperly interpreted medical evidence to analyze her ability to stand and walk, and the significance of her lack of muscular atrophy. However, the ALJ properly reviewed and summarized the record, in which Plaintiff demonstrated the ability to heel/toe and tandem walk, and her gait was stable and sustainable without an assistive device (Tr. 23-24 (citing Tr. 466, 468)). Again, the ALJ did not interpret the evidence but accurately cited to Plaintiff's ability to stand and walk during her consultative examination with Dr. Jan, and she considered that evidence in finding that Plaintiff could perform a reduced range of light work (Tr. 23-24). *See DuCharme v. Kijakazi*, No. 21-2204, 2022 WL 328974, at *3 (7th Cir. Aug. 11, 2022) (no error where ALJ reviewed medical records in determining the RFC).

The ALJ also noted Dr. Jan's observation that Plaintiff did not have muscular atrophy, and she noted that atrophy is a common side effect of prolonged lack of muscle use in order to avoid pain (Tr. 26, 468). Plaintiff contends that the ALJ "is not qualified to discuss muscular atrophy and no medical source is given for their assertions on the condition" (Pl. Br. 17). However, the ALJ's discussion of atrophy is consistent with the agency's Social Security Ruling (SSR) 16-3p, which recognizes that:

> [A]n individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the

10

> record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms.

SSR 16-3p. Under these guidelines, the ALJ properly considered Plaintiff's lack of muscular atrophy in evaluating her alleged inability to stand and walk for prolonged periods (Tr. 26). *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999) ("SSRs are interpretive rulings intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs 'binding on all components of the Social Security Administration.'")

Plaintiff also contends that the ALJ improperly interpreted her poor effort during Dr. Jan's examination as evidence that she could perform light work. She speculates that "[i]t is not only logical, but highly likely the poor effort was a symptom of the migraine" (Pl. Br. 19-20). However, while the ALJ referenced Plaintiff's poor effort during the examination, she also noted that during the same examination, Dr. Jan observed that Plaintiff had full muscle strength in her arms and legs, and full grip strength in her hands (Tr. 26, 28-29 (citing Tr. 468)). Moreover, in addition to that examination, the ALJ discussed a June 2019 examination where Plaintiff demonstrated generally normal motor power and muscle tone in her arms and legs (Tr. 27 (citing Tr. 489)). Based on that evidence, it was reasonable for the ALJ to determine that Plaintiff could perform the lifting requirements of light work (Tr. 21). Beyond speculation, Plaintiff fails to show that she was more limited. *Karr*, 989 F.3d at 513 (it is plaintiffs' burden to identify objective evidence corroborating her claims).

Plaintiff also asserts that her moderate limitations in interaction are not adequately addressed by the ALJ's RFC finding limiting her to frequent interaction with supervisors,

11

coworkers, and the general public. She maintains that the ALJ failed to acknowledge her repeated diagnoses of general anxiety, depression, and social anxiety, but the ALJ expressly found each of those impairments severe (Tr. 18). The ALJ also discussed treatment records, noting Plaintiff's reports of a poor stress response, anxiety in large crowds, and the fact that anxiety and stress triggered her migraines (Tr. 19-20, 23 (citing Tr. 465, 488)). However, Plaintiff was generally noted to be cooperative, with normal mood and affect during examinations (Tr. 19, 23 (citing Tr. 468, 476)).

The ALJ also acknowledged Plaintiff's October 2019 mental consultative examination with Dan Boen, Ph.D., where she reported anxiety and nervousness in social situations, but she was cooperative and her judgment and insight were normal during the examination (Tr. 24 (citing Tr. 473-77)). Dr. Boen opined that Plaintiff would have trouble getting along with coworkers, but no difficulty getting along with a boss (Tr. 477). State agency psychologists Kenneth Neville, Ph.D., and William Shipley, Ph.D., reviewed the medical record, including Dr. Boen's examination report, and opined that Plaintiff had no limitations in interacting with others (Tr. 202, 214-15).

The ALJ properly resolved the conflicting opinion evidence by determining that Plaintiff had a moderate limitation in interaction, and she accounted for that limitation by restricting Plaintiff to no more than frequent interaction with others (Tr. 21, 29-30). *Garland v. Dai*, 141 S. Ct. 1669, 1677 (2021) ("[A] reviewing court must be mindful too that the agency, like any reasonable factfinder, is free to credit part of a witness' testimony without necessarily accepting it all.") (citations, alteration, and internal quotation marks omitted). Plaintiff relies on her subjective reports of limited interaction to argue that the RFC finding was flawed . However,

12

Plaintiff fails to challenge the ALJ's evaluation of the opinion evidence, or cite to additional evidence showing that she could not frequently interact with others.

Plaintiff next contends that the vocational expert failed to provide an adequate explanation for the methodology she used to estimate the number of jobs available at step five. *See Chavez v. Berryhill*, 895 F.3d 962, 968-70 (7th Cir. 2018) (the vocational expert must offer "a reasonable and principled explanation" to support her approximation, but "establishing the reliability of a job number estimate does not require meeting an overly exacting standard").

In this case, the ALJ took steps to establish the reliability of job number estimates before making her determination at step five. After Plaintiff objected to the reliability of the vocational expert's testimony at the first administrative hearing, the ALJ agreed that the numbers given were not reliable, and she ordered a supplemental hearing (Tr. 15, 59-73, 94-99). At the supplemental hearing, counsel asked the vocational expert about her background, and the vocational expert testified that she had a Master's degree in rehabilitation psychology, and during her studies she took classes in statistics and participated in the preparation of a survey related to estimating population numbers (Tr. 60-61). Counsel did not object to her qualifications (Tr. 61).

The ALJ then asked the vocational expert whether there would be any jobs available for a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity (Tr. 61-62). The vocational expert testified that the individual could perform jobs such as cleaner/housekeeper, with 222,000 jobs in the national economy; office helper, with 14,000 jobs in the national economy; and storage rental clerk, with 63,000 jobs in the national economy (Tr. 62-63).

On questioning from Plaintiff's counsel, the vocational expert stated that the data she used to provide job numbers was the most recent data available for the year 2021 (Tr. 64). She explained that in estimating the number of jobs, she used Job Browser Pro, a program which compiles data by DOT code (Tr. 65). Counsel then asked the vocational expert follow-up questions regarding Job Browser Pro:

> Q: So, tell me what formula Job Browser Pro uses to weigh the numbers in the SOC codes, to weigh the DOT categories and SOC codes?
> A: Now, I would have to read that specifically from the information I have here. I can't tell you exactly off hand that particular data.
> Q: So, the answer is that you're sitting there, you don't know, is that correct?
> A: As I'm sitting here right now, correct. I could read the summary and abstract for SkillTRAN estimating employment numbers, which I have in front of me, but I don't know it just off the top of my head.

(Tr. 65). Counsel did not follow-up and ask the vocational expert to read the summary and abstract. Instead, he objected to the testimony and stated that "the fact that the witness cannot describe the weighing formula from Job Browser Pro . . . would be insufficient in order to establish the [re]liability of the numbers" (Tr. 70). He further objected to the weighting of job numbers, arguing that there was no rational way of severing different skill levels and exertional jobs within the SOC codes and DOT codes (Tr. 70).

The ALJ noted that she would take those objections into consideration, and she asked additional questions of the vocational expert (Tr. 70-71). The vocational expert clarified that Job Browser Pro was capable of separating jobs by DOT title and not by SOC code, meaning that the program weeded out jobs with differing exertional levels (Tr. 71). She also stated that every vocational expert that she knows relies upon Job Browser Pro (Tr. 71).

Plaintiff argues that the vocational expert's testimony was not reliable because "[w]hen

14

pressed, the VE stated they could read a summary and abstract which supposedly explained the methodology, but this was never done" (Pl. Br. 21-22). However, Plaintiff fails to acknowledge that the vocational expert offered—twice—to read the summary and abstract, and counsel did not ask her to do so (Tr. 65, 71). The testimony makes clear that the vocational expert was prepared to provide the underlying source of her job number data, but counsel declined to pursue the information further. *See Krell*, 931 F.3d at 587 (vocational experts are encouraged, but not required, to have underlying sources available at the hearing) (citing *Biestek*, 139 S. Ct. 1157). Moreover, the vocational expert provided uncontradicted testimony that her underlying source, Job Browser Pro, was generally accepted within the relevant scientific community as a reliable source for job numbers (Tr. 71). Thus, counsel failed to identify any specific shortcomings in the formula or job number estimates. *See Coyier v. Saul*, 860 F. App'x 426, 428 (7th Cir. 2021) ("Because counsel failed to develop an argument or question the VE any further about his methodology, the ALJ was entitled to rely on the job-number estimates.").

Plaintiff argues that requiring her to ask the vocational expert to read the summary and abstract shifts the burden of proof onto Plaintiff, and it is the Commissioners burden as Step 5. This is nonsensical. Clearly, the vocational expert explained the basis for the job numbers such that the ALJ's decision to accept those numbers was supported by substantial evidence. If Plaintiff wanted a more thorough explanation, it was up to her to ask. Plaintiff cannot decline an offer of information and then object that the information was not recited into the record.

As the Commissioner notes, Plaintiff does not point to any indicia of unreliability in the

15

vocational expert's testimony.[2] During the hearing, the ALJ considered counsel's objection regarding the "weighting" of job numbers within SOC and DOT codes (Tr. 70-71). In response to the ALJ's follow-up questions, the vocational expert clarified that Job Browser Pro was capable of differentiating job numbers by exertional and skill levels, and the jobs were broken out by DOT title and not by SOC code (Tr. 71). She also confirmed that the program was commonly used by vocational experts (Tr. 70-71). Thus, the vocational expert supplied a foundation for her job number estimate so as to provide a "modicum of confidence in its reliability." *See Chavez*, 895 F.3d at 969; *Biestek*, 139 S. Ct. at 1156-57 (vocational expert testimony may be deemed reliable "[e]ven without specific data" and "even without significant testing.").

Here, the vocational expert identified the source for her job number estimates, she offered to provide additional information on the underlying data source, and she provided a straightforward explanation for the reliability of the numbers she provided. This testimony was "the kind of evidence—far more than a mere scintilla—that a reasonable mind might accept as adequate to support a finding about job availability." *Biestek*, 139 S. Ct. at 1155 (internal quotation marks and citation omitted). The ALJ reasonably overruled Plaintiff's objections, and relied on the vocational expert's testimony at step five (Tr. 31-32). *See Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020) (even if a vocational expert's testimony does "not reveal the precise mechanical and statistical model involved," it can nonetheless constitute a "reasoned and

---

[2] Plaintiff again accuses the Commissioner of attempting to shift the burden of proof onto Plaintiff, as it is the ALJ's job to determine the reliability of the vocational expert's testimony. However, the ALJ performed her job and determined that the testimony was reliable. Plaintiff attempted to contest the ALJ's determination but failed to show any way that the testimony was unreliable. This is not an instance of shifting the burden of proof, but merely an instance of requiring Plaintiff to support her argument with facts, rather than mere speculation.

principled explanation" at least by the low substantial evidence standard).

As there is no basis for remand on any of the issues raised by Plaintiff, the decision will be affirmed.

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby AFFIRMED.

Entered: December 2, 2022.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court